# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>A residence located at 1247 Amherst Avenue,<br>Apartment 1, Los Angeles, CA 90025 | )<br>)<br>)<br>)<br>)<br>) |

Case No. **2:23-MJ-04563**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threat by interstate communication |
| 18 U.S.C. § 2261A(2) | Stalking |
| 18 U.S.C. § 922(g)(8) | Prohibited person with a firearm |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Jacob Tomes, FBI Special Agent*
_____
*Applicant's signature*

Jacob Tomes, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Honorable Margo A. Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Alix McKenna (x 6166)

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The SUBJECT PREMISES is located at 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025.  The SUBJECT PREMISES is located within a two story apartment building with tan stucco, red brick veneer, red roofing tiles, and a bottom level parking garage.

The search shall include any appurtenances, outbuildings, garages, sheds, carports, storage facilities, and containers -- such as storage lockers, storage spaces, or trash cans -- assigned to Apartment 1.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are fruits, instrumentalities, and evidence of violations of 18 U.S.C. §§ 875(c) (threat by interstate communication), 2261A (stalking), and 922(g)(8) (prohibited person with a firearm) (collectively, the "Subject Offenses"), namely:

a.    Any firearms, ammunition, or weapons accessories, such as holsters, slings, scopes, optics, cases, safes, or magazines;

e.    Data, records, documents, programs, applications or materials relating to killing, maiming, shooting, ADD OTHER SPECIFICS RE THE THREATS HE MADE other people, including judicial officers, court staff, and/or family members of judicial officers and court staff;

f.    Data, records, documents, programs, applications or materials relating to attempting to locate addresses or other personal information related to judicial officers and court staff.

g.    Any documents, notes, manifestos, or other written materials containing details regarding the aforementioned incidents. During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

h.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email or social media communications or other

i

text or written communications sent to or received from any digital device;

  i. Contents of any calendar or date book, including any calendars or date books stored on any digital devices;

  j. Audio recordings, photographs, video recordings or still captured images on any digital device, phone memory cards, or other storage related to obtaining firearms, possessing firearms, or threats to public officials or their family members;

  k. GPS coordinates and other location information or records identifying travel routes, destinations, origination points, and other locations;

  l. Any digital device used to facilitate the above listed violations and forensic copies thereof.

43. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

  a. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

  b. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

  c. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as

evidence of the presence or absence of security software designed to detect malicious software;

       d.   evidence of the attachment of other devices;

       e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       f.   evidence of the times the device was used;

       g.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

       h.   records of or information about Internet Protocol addresses used by the device.

       i.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

       j.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

<u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

44.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be

seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

i.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

       j.   During the execution of this search warrant, law enforcement is permitted to: (1) depress LIPMAN's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of LIPMAN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    2.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, JACOB TOMES, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and have been so employed since February 2023.  I am currently assigned to a criminal threats squad located at the Joint Regional Intelligence Center in Norwalk, California (CA) 90650. While assigned to the criminal threats squad, I have investigated crimes such as threats, stalking, harassment, and school shooting threats. I have developed expertise in assessing threats to determine their validity, seriousness, and imminence.

2.   I have been employed as a sworn law enforcement officer for five years, serving with the City of Fullerton Police Department, City of Menifee Police Department, and the Federal Bureau of Investigation.  As a sworn Police Officer and FBI Special Agent, I have investigated a wide range of crimes to include narcotics trafficking, kidnappings, firearms violations, gang crimes, court order violations, sex crimes, elder and child abuse, homicides, robberies, attempted murder, and others.

3.   I have lead numerous investigations in which I have prepared search warrant affidavits and successfully lead the authorized searches at various locations.

### II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of a warrant to search 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025

(the "Subject Premises") as more fully described in attachment A, to search for and seize evidence itemized in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 875(c) (threat by interstate communication), 2261A(2) (stalking), and 922(g)(8) (prohibited person with a firearm) (collectively, the "Subject Offenses").

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   In May of 2022, Jonathan LIPMAN ("LIPMAN"), a Los Angeles resident, posted threatening content on a Facebook page belonging to the Lacey Township Police Department (LTPD) in the State of New Jersey from an account under his own name.  As a result, LTPD filed for a temporary extreme risk protective order to prevent LIPMAN from possessing firearms.  On July 8, 2022, Lacey Township Municipal Court Judge Benjamin Mabie signed the temporary order.  The following day, a Los Angeles Police Department officer served the order on LIPMAN in California.  On

January 31, 2023, New Jersey Superior Court Judge Kim Marie Rahill signed a Final Extreme Risk Protective Order, which succeeded the temporary order and prohibited LIPMAN from possessing firearms.

7.   Beginning on or around February 1, 2023, LIPMAN started sending hundreds of harassing and threatening emails to New Jersey public officials, including Lacey Municipal Judge Mabie, Oceanport Municipal Judge Patti, Lacey Township Official Bruce Padilla, Ocean Superior Court Judge Rahill, and several others. In many of these emails, LIPMAN wrote in explicit detail how LIPMAN hoped the aforementioned public officials would die painful, gruesome, and violent deaths.  On February 1, 2023, LIPMAN emailed Judge Rahill a picture of what appeared to be a lever action shotgun.

8.   On July 13, 2023, Los Angeles Police Department ("LAPD") Detective Cao made contact with LIPMAN at the Subject Premises and spoke to him regarding the threatening emails he had been sending.  LIPMAN told Detective Cao that he would continue to send threatening emails. Less than two weeks later, LIPMAN sent Judge Rahill 11 threatening emails explaining how he would like to see her die. As of September 6, 2023, LIPMAN had sent approximately 400 emails to the aforementioned victims, a majority of which have been threatening, violent, or harassing in nature.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.   The information below is based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation.

10.   On July 7, 2023, I was assigned a criminal threats and stalking case which had been reported to the FBI by the New Jersey Court and Judicial Security Unit ("New Jersey Court Security").  I spoke to and received documents from several individuals at the New Jersey Court Security including Chief Robin Morante, Judicial Risk Assessment Manager James Pisano, and Security Programs Coordinator Katherine Grzeda.  I reviewed a report authored by New Jersey State Police Department (NJSP) Detective D. Harrison who had been investigating LIPMAN for the same series of ongoing criminal threats and stalking conducted by LIPMAN against several public officials in New Jersey.

11.   I know from my conversations with New Jersey Court Security personnel and review of documents provided by NJSP and New Jersey Court Security that around May 3, 2022, a user with the name "Jonathan Lipman" posted threatening content on the Facebook page belonging to the Lacey Township Police Department (LTPD) in the State of New Jersey. In these Facebook posts, Lipman made statements such as "You and your officers an their families will regret your continued cover up", "Gary quinn doesn't belong on a plaque. He belongs on someones mantle", "They and their families lives don't matter. The world would be better off it officers like Dallas Gant were removed from the planet," and "Their children will pay."

12.  I know based on my review of the Extreme Risk Protective Order that LTPD subsequently filed for a Temporary Extreme Risk Protective Order in the State of New Jersey, which was signed by Lacey Township Municipal Court Judge Benjamin Mabie on July 8, 2022.  The protective order required LIPMAN to surrender any firearms and ammunition in his possession and prohibited LIPMAN from purchasing any additional firearms.

13. I know according to New Jersey Court Security personnel, that during court proceedings for the Extreme Risk Protective Order, LIPMAN was residing in Los Angeles, California and was attending online virtual court hearings.  LIPMAN had previously been a resident of New Jersey.

14. I know based on my conversations with New Jersey Court Security and Los Angeles Police Department officers that once the temporary order was granted, New Jersey Court Security sent service documents to LAPD.  LAPD Officer T. Nguyen served LIPMAN with the Extreme Risk Protective Order at the Subject Premises on July 9, 2022.  A search for firearms was not conducted and LIPMAN did not surrender any firearms to LAPD at that time.

15. A California DMV records check revealed that LIPMAN has a 2014 Hyundai with a license plate number of 7FZF800 registered to him with an address of 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025 (i.e., the Subject Premises).

16. I know based on my review of the Final Extreme Risk Protective order that the Final Extreme Risk Protective Order

was granted and signed by Superior Court Judge Kim Marie Rahill
on January 31, 2023. This Final Extreme Risk Protective Order
was granted to supersede and replace the previous Temporary
Extreme Risk Protective Order. As of the date of this filing,
the restraining order is current and will remain in place
indefinitely until or unless a petition is filed by LIPMAN to
vacate the order.  I know based upon my review of email
correspondence between LIPMAN and Erin Caulfield that LIPMAN
received notice of his court hearings and was provided with
instructions on how to participate in the virtual court
hearings.

17. I know based on my conversations with New Jersey Court
Security personnel and review of emails that after the court
proceedings for the protective order, LIPMAN began sending an
extensive series of emails to several public officials, court
employees, judges, and LTPD police officers.  LIPMAN emailed
threatening messages directly to or mentioned the following
individuals in the emails: Ocean Superior Court Judge Kim Marie
Rahill, Lacey Municipal Judge Benjamin Mabie, Ocean County
Commissioner Gary Quinn, Attorney Bruce Padula, Probation
Officer Erin Caulfield, Municipal Court Judge John Patti,
Oceanport Police Chief Michael Kelly, LTPD Police Officer C.
Kenney, LTPD Police Officer D. Gant, and other miscellaneous
individuals. I was provided with copies of approximately 400 of

these emails by New Jersey Court Security and have reviewed
them. LIPMAN sent these emails from several email accounts to
include jlipman52@gmail.com, rentpoetfraud@gmail.com,
ocjudgesarecapitalistliars@gmail.com, and
laceyviolatesconstitution@gmail.com.  In many of these emails,
LIPMAN either included the signature "Jonathan Lipman" in the
body of the emails, mentioned "Jonathan Lipman" by name,
responded to official court correspondence, or in one instance
sent a photograph of himself in the email, indicating that the
email addresses belong to and / or were operated by LIPMAN.
Specifically, LIPMAN emailed Judge Rahill approximately 6 times
on February 4, 2023, approximately 3 times on March 28, 2023,
approximately 11 times on July 23, 2023, and on several other
dates. LIPMAN also emailed Judge Patti, Chief Kelly, Bruce
Padula, and other recipients approximately 96 times on July 25,
2023 and Officers Kenny and Gant approximately 32 times on July
9 and 10 of 2023. LIPMAN sent hundreds of other emails to these
recipients and others from approximately February 1, 2023 up to
September 6, 2023.  LIPMAN's initial emails contained
explanations as to why LIPMAN felt his constitutional rights had
been violated by the aforementioned individuals during his
Extreme Risk Protective Order court proceedings. As described
below, the emails quickly turned threatening in nature and
included graphic and violent descriptions of how LIPMAN prayed,

desired, wished, and fantasized for the aforementioned individuals to die.

18. Around February 1, 2023, LIPMAN sent an email to Judge Kimarie Rahill from the email address "jiplman52@gmail.com" titled "Is a photo illegal?"  The body of the email only included the text " ;) " (winking emoticon) and a picture of a lever action shotgun. The following is the photograph that was sent:



The email was signed "Jonathan Lipman" at the end of the email. Based on my training and experience, the firearm in the photograph appeared to be real with no features to indicate that the firearm was fake; however, it is impossible to determine without physically examining the firearm.  A reverse image search of the shotgun was conducted by SA Tomes and received negative results indicating LIPMAN had likely taken the photograph of the shotgun himself.

19. On February 1, 2023, according to New Jersey Court Security, LIPMAN left a voice message for Judge Rahill on Erin Caulfield's telephone in which LIPMAN stated, "it's a shame there are kids that get shot up in schools instead of you people."

20. I know from a report authored by NJSP Detective Harrison that around February 1, 2023, Detective Harrison interviewed LIPMAN via LIPMAN's telephone. Detective Harrison indicated in his report that LIPMAN'S phone number was (609) 618-2597. Detective Harrison asked him about the picture of the shotgun LIPMAN had emailed to Judge Rahill.  LIPMAN told Detective Harrison that he was exercising his first amendment rights, that firearm seen in the image was just a "prop", and that LIPMAN does not own firearms. LIPMAN sent Detective Harrison a copy of LIPMAN's California Driver's License and confirmed his identity.

21. According to NJCJSP reports, Around February 23, 2023, Judge Rahill's neighbor; Edward O'Neill, received a voicemail from LIPMAN using telephone number (609) 618-2597 stating "I don't know if you are Kimarie Rahill's neighbor but if you are you are in danger. She has violated my rights and will do the same to you. She also does not believe in the constitution, which is also a danger". LIPMAN has no known association with O'Neil.  New Jersey Court Security expressed concern that LIPMAN appeared to be researching the home address of Judge Rahill and her neighbor O'Neill, and subsequently making unsolicited phone calls to O'Neill. According to NJSP reports, the telephone number (609) 618-2597 was verified to be LIPMAN'S telephone number based upon NJSP's prior contact telephonic contact with LIPMAN.

22. Around February 27, 2023, Carol Smith, the court administrator for Judge Patti, along with James Butler and Bruce Padula, all received an email from LIPMAN sent from the email address jlipman52@gmail.com containing a photograph of LIPMAN with a white rope noose around his neck. In the photograph, LIPMAN is seen holding an iPhone. The email contained the signature "Jonathan Lipman".

23. Around March 28, 2023, LIPMAN sent Judge Rahill three emails from the email address jlipman52@gmail.com. In one of the emails, LIPMAN wrote "But as you struggle to breath or what ever

consequence your selfish little life befalls you body and betrays your existence, you will remember me. You concerns about where you are headed are warranted. Some call it hell". The email was signed "Jonathan Lipman".

24. Around April 3, 2023, and April 5, 2023, LIPMAN sent approximately 8 emails from the email address jlipman52@gmail.com to various recipients including Judge Rahill, Chief Kelly, Judge Patti, and Bruce Padula. In one email sent to Chief Kelly, Bruce Padula, John Patti, and others, LIPMAN wrote "just saying the world would be better off if you and your children were kidnapped, imprisoned, and then put in a gas chamber". Several of these emails were signed "Jonathan Lipman" in the body of the emails.

25. Around April 7, 2023, an email titled "Bigoted Judges the world would be better off being removed from existence" was sent to Judge Rahill and several other recipients from the email address ocjudgesarecapitalistliars@gmail.com. The author refers to Jonathan Lipman several times in the body of the email and writes in the same style as LIPMAN'S other emails. For these reasons, it is believed LIPMAN is the author of this email. In the email, the author writes "We are watching you judges" and "You will regret it.".

26. Around June 7, 2023, and June 30, 2023, LIPMAN sent approximately 17 emails from the email address

jlipman52@gmail.com to various recipients including Bruce
Padula, Judge Patti, and Chief Kelly. In one email sent on June
30, 2023, LIPMAN wrote "The world would be better off if Bruce
died a painful death as his wife and children helplessly
watched, I pray his blood is splattered all over his family so
they can pay for his sins too" and "Michael Kelly, I pray he is
ran over in a traffic stop. The world would be better off if
chief Michael Kelly became one with the pavement like a crushed
bug".  Several of these emails were signed "Jonathan Lipman" in
the body of the emails.

27. Around June 30, 2023 LIPMAN sent an email to Judge
Patti and other officials using the email address
jlipman52@gmail.com stating "Most of all though, the world would
be better off if John Patti was executed French Revolution style
and his head was passed around for people to fuck with. Just to
make a demonstration of what happens to people who trample on
civil right."

28. Around July 9, 2023, and July 10, 2023, LIPMAN sent
numerous emails from "jlipman52@gmail.com" signed "Jonathan
Lipman" to LTPD Officers C. Kenney and D. Gant.  In these emails
LIPMAN made statements such as "Gary wuinns head will be on my
mantle. It was always going to be a bobblehead. It will be on
others mantles too", and "This time I made threats though. Which
means as a California resident I should be charged with the

federal crime of making terroristic threats", and "beheadings, cancer, bullets to the head. Im not god. Its not my decision. But whatever way that removes these terrible government employees who would make better corpses than people i pray god takes."  Several of these emails were signed "Jonathan Lipman" in the body of the emails.

29. Around July 13, 2023, LAPD Detective Cao made contact with LIPMAN at his residence located at 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025 (i.e., the "Subject Premises"). The address of 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025 is listed as Lipman's address on his California Driver's License.  Detective Cao spoke to LIPMAN regarding the emails being sent to New Jersey public officials. LIPMAN stated he does not want to hurt anyone.  LIPMAN stated he was in control but was trying hard to "not cross over the line". Detective Cao asked LIPMAN if he would stop sending emails to public officials in New Jersey, to which LIPMAN stated if he was not going to be placed under arrest, he would continue to send emails.

30. Around July 23, 2023, Judge Rahill received about 11 emails sent from "laceyviolatesconstitution@gmail.com". The emails appeared to have been sent by LIPMAN based upon the recipient, writing style, and nature of the emails. In the emails, the author wrote in explicit detail about how he prays

13

and hopes Judge Rahill will die. In one email titled "knives over guns", the author stated "guns are too quick now I could be talking about in a movie or a tv show. I could be talking about in a book. I could be talking about a radio play".  In another email to Judge Rahill, the author wrote "Let us imagine Alexander Burr, Alexander Hamilton, Patrick Henry, James Madison, thomas paine, and John Jay, all gun owners who called for the execution of tyrants like Kimarie Rahill, breaking into kimarie Rahills house in the middle of the night and removing her at gun point", and "lets imagine kimarie rahill being dragged to the gallows", and "Then Kimarie Rahill is beheaded. Her head is placed on a stick. Her limbs and body parts sold as souvenirs."  The author then made the statement, "Now of course this is just a fantasy. No crime has ever been committed. Nothing has been threatened. No threats had even been instituted".

31. Around July 25, 2023, a series of emails was sent to Bruce Padula, Chief Kelly, Judge Patti, and other recipients from the email address rentpoetfraud@gmail.com. In one email, the author writes "You will never prove Jonathan Lipman wrote anything though.". On the same day, the author sent several violent and threatening emails including one email titled, "Bruce Padula is covering a knife attack on a jewish person". In the body of this email, the author writes "lets imagine the

knife cutting deep as he begs and pleads to live and the person supposed to protect him does nothing.".  In another email sent from rentpoetfraud@gmail.com on the same day the author writes "but how would you all look if jonathan lipman snapped and killed someone in a 10 years because they couldn't handle Monmouth, ocean and new jersey governments persecuting them for seeking their first amendment right…".

32. Around August 5, 2023, an email was sent from the email address rentpoetfraud@gmail.com to Judge Mabie, Judge Rahill, Officer Kenny, and various other recipients titled "A Violent Terroristic Threat". In the email, the author states "he is more likely to come to ocean county than Jonathan lipman… make sure to remove his right to own weapons. Don't just limit it to guns".

33. Around August 9, 2023, an email was sent from the email address rentpoetfraud@gmail.com to Judge Mabie, Judge Rahill, Judge Patti, Chief Kelly, in which the author states "Jonathan lipman has a right to die as the governments martyr just like jesus". The author of all these emails sent from rentpoetfraud@gmail.com wrote in the same style as other emails sent by LIPMAN, sent the emails to the same recipients, and mentioned LIPMAN by name in the body of the emails. For these reasons, it is believed the author of the emails sent from rentpoetfraud@gmail.com is LIPMAN himself.

34. Around August 24, 2023, Judge Patti received about 28 voicemails from the telephone number (609) 618-2597, which according to NJSP belongs to LIPMAN. New Jersey Court Security provided me with recordings of the voicemails, and I reviewed them. In the voicemails, LIPMAN states repeatedly that "John Patti is a worthless bigot" for various reasons. In several voicemails LIPMAN states "John Patti is a worthless bigot the world would be better off without".  LIPMAN also explains in several voicemails that he does not have a right to directly threaten to harm Judge Patti, but he does have a right to say that he hopes and wishes death upon Judge Patti.

35. As of September 6, 2023, New Jersey Court Security provided me with, and I have reviewed approximately 400 emails that LIPMAN sent to public officials between February 1, 2023 and September 6, 2023 using several email addresses including jlipman52@gmail.com, laceyviolatesconsitution@gmail.com, rentpoetfraud@gmail.com, and ocjudgesarecapitalistliars@gmail.com.  A majority of these emails are threatening, violent, or harassing in nature. I have also reviewed numerous reports detailing the instances when LIPMAN called New Jersey public officials and their associates. In a majority of these emails and telephone calls, LIPMAN explains in varying levels of detail how he prays, desires, and wishes for these New Jersey public officials to die gruesome

deaths.  LIPMAN often qualifies his statements by writing that
he is not violent and that these are not actually threats but
rather fantasies.

36. New Jersey Court Security reports stated they have
received emails from LIPMAN from the following email addresses:
ocjudgesarecapitalistliars@gmail.com, jLIPMAN52@gmail.com,
rentpoetfraud@gmail.com, jonathanlipmannumber2001@gmail.com, and
laceyviolatesconstitution@gmail.com in what appears to be an
attempt by LIPMAN to avoid public officials from blocking his
emails and to conceal his identity. New Jersey Court Security
Security Programs Coordinator Katherine Grzeda stated as on
September 6, 2023, LIPMAN continues to send threatening emails
to public officials on a regular basis. SA Tomes reviewed and
confirmed LIPMAN has continued to send emails to New Jersey
public officials as of September 6, 2023.

37. Due to the extensive volume and frequency of LIPMAN's
correspondence to various New Jersey public officials, this
statement of probable cause does not set forth each and
every fact that I or others have learned during the course
of this investigation, but rather, only the facts necessary to
establish probable cause that the aforementioned criminal
statutes have been violated.

### V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

38. Based on my training, experience, and information from
those involved in the forensic examination of digital devices,

I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

       c.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress LIPMAN's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of LIPMAN's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

### VI. TRAINING AND EXPERIENCE ON FIREARM OFFENSES

41. From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

       a.    Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such as, in their vehicles or in their digital devices.
It has been my experience that prohibited individuals who own
firearms illegally will keep the contact information of the
individual who is supplying firearms to prohibited individuals
or other individuals involved in criminal activities for future
purchases or referrals.  Such information is also kept on
digital devices.

       b.    Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves

possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

//

//

//

## VII. <u>CONCLUSION</u>

42. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the Subject Premises, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
September, 2023.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE

23